THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. ALEJANDRO LEBRÓN, alias TITO, Defendant and Appellant.

No. 9316. Argued January 26, 1943.—Decided March 29, 1943.

F. García Quiñones for appellant. R. A. Gómez, Prosecuting Attorney (Fiscal), for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

Appellant was convicted of the crimes of murder in the second degree and of carrying a weapon, and sentenced to serve ten years in the penitentiary and three months in jail, respectively. He did not deny having killed the deceased; but he pleaded that he did so in self-defense. The nature of the errors with which the appellant charges the lower court requires that, for a better understanding of the discussion, we make a summary of the evidence of both parties, as well as a report on the proceedings that took place since the defendant was found guilty of both crimes on January 17, 1941, up to the time that the penalty was imposed upon him on October 3, 1941, in the felony case, and on October 10, 1941, in the misdemeanor case.

The theory of the prosecution may be summarized as follows: On or about October 5, 1940, the defendant, the deceased, one Williams, and others were playing a card game known as "Black-Jack" in the yard of a house on Cerra Street, in Santurce. Williams got ready to withdraw, and, as the deceased owed him 12 cents on account of the game, he asked him to pay before leaving. The deceased, saying he had no money, asked the defendant to pay Williams the 12 cents, which the defendant owed the deceased for the same reason. This suggestion of the deceased gave rise to certain words between him and the defendant, who stood up and made a gesture to draw out a weapon to attack the deceased. In view of defendant's attitude, the deceased, armed with a chair, attacked the defendant, inflicting a wound on his head and knocking him down as a result of the assault. The persons there present interfered to prevent the fight

from continuing, and one of them, Lorenzo Vélez, washed defendant's head and took him to his home. The deceased also went home, in the same Cerra Street, near the defendant's home. After the deceased had his supper at home and changed his clothes, he went to visit his sweetheart, who also lived on Cerra Street, near the deceased and the defendant. While this happened, the defendant left his home armed with a knife and entered the small café of Ramón Avilés, likewise on Cerra Street, very near the house of the deceased's sweetheart. After buying cigarettes there, he stationed himself in the door of the establishment, and upon noting that the deceased was standing by the fence of the house of his sweetheart, talking with her, called him. The deceased heeded the call and went towards the defendant who, without saying a word, attacked him with the knife he was carrying, the deceased falling down immediately and dying a few hours later as a result of the wound he received.

The theory of the defense, in synthesis, is the following: On the day of the occurrence, the defendant was having his supper at home. The deceased, whom the defendant owed 12 cents which he had previously lent him, entered the defendant's backyard and called him. The defendant went to the deceased, who asked him to pay him the 12 cents which he owed him, but as the defendant did not have any change at the time, he showed him a dollar bill and told him to wait until he changed it. The defendant turned his back, and at that moment the deceased grasped a chair and with it inflicted upon him two wounds on the head, defendant falling wounded. His wounds were washed at home, but as he was bleeding profusely, he decided to have them dressed at the first-aid station at Stop 17. At that moment, defendant already knew that the deceased had stated his intention of killing him. While going to the first-aid station, he entered the small café of Ramón Avilés, bought cigarettes and gave one to a friend whom he

found there, and to whom he told all that had happened between him and the deceased. The friend offered to accompany him to the first-aid station, but the defendant refused. He had not walked two steps from the small café when he found the deceased who was standing around there. The deceased immediately gave him a kick and the defendant stepped back, but when the deceased pulled a weapon from inside his shirt and attacked him several times with it, defendant, believing the deceased was going to kill him, attacked him once with the knife he had brought from his home, inflicting upon him the mortal wound.

From the beginning of the trial for murder until the jury rendered a verdict on January 17, 1941, Judge R. H. Todd, Jr., then Judge of the lower court, presided over that court. At the same time, upon the stipulation of the parties, the case for carrying weapons was submitted to the same Judge upon the evidence introduced in the case for murder. Judge Todd received the verdict and pronounced the defendant guilty of the crime of murder in the second degree. At the same time, on the basis of the evidence introduced in the murder case, he pronounced the defendant guilty of the crime of carrying weapons. In both cases, the imposition of the penalty was set for the twenty-fourth of January, 1941, since the defendant asked that the imposition of the penalty corresponding to the carrying of weapons be postponed until then.

Previous to the date set for the pronouncement of sentence in both cases, the defendant asked and obtained permission to file a motion for a new trial. This circumstance left without effect the setting that had been made for the 24th of January in the case for murder, and as the case for carrying weapons had been submitted on the same evidence, undoubtedly the judge thought that in this last case it was advisable to leave the imposition of the penalty pending until the motion for new trial in the murder case was de-

cided. But Judge Todd was appointed Associate Justice of this court on the 20th of February and on the following day qualified, and therefore, he could not impose the penalties in the cited cases. On October 3, 1941, another of the judges of the lower court, Hon. Marcelino Romany, issued an order dismissing the motion for a new trial in the murder case and immediately imposed upon the defendant the penalty of 10 years' imprisonment in the penitentiary for said crime. As to the crime of carrying weapons, Judge Romany, erroneously believing that Judge Todd had made no pronouncement, on his own initiative decreed a new trial, which he set for October 10, 1941, to be presided over by another judge of the same court, who at the time was in charge of misdemeanor cases. On said date, having learned from the minutes of January 17, 1941, that Judge Todd had found the defendant guilty of the crime of carrying weapons, and that he only had pending the imposition of the penalty, he set aside the ruling granting a new trial and, in the presence of the defendant and his counsel, sentenced the defendant to the penalty of three months in jail, without costs.

█ Defendant contends that since the trial for murder had not been held before Judge Romany, the latter lacked jurisdiction to impose the penalty. He does not cite any authority in support of his assertion. We have already explained the reasons that prevented Judge Todd from imposing the penalty in both cases.

The best practice is that a judge who begins a trial and hears the evidence should render judgment accordingly, but given the extraordinary situation created by the recent appointment of the judge who sat on the case and defendant not being in any way prejudiced by being sentenced by another judge of the same court in which the trial was held, the acts of such judge in imposing the penalty in both cases are perfectly valid.

In American Law Reports, vol. 114, p. 435, we find a lengthy annotation in which a careful study of the matter is made, and a considerable number of cases, federal as well as state, are classified and analyzed. They are all unanimous in that: although this is a practice which should not be encouraged, nevertheless when, as in the instant case, extraordinary circumstances arise which prevent the judge who presided at the trial from passing sentence, if the fact that it is another judge who passes sentence does not prejudice the defendant, the judgment is valid.

The fact that the penalty imposed is the minimum which the law provides for the crime proves that in the murder case no prejudice could have been caused the defendant. Under no circumstances could Judge Todd have imposed a penalty less then ten years' imprisonment. By this, we do not mean to say that in order to understand that no prejudice has been caused a defendant, the judge who replaces another is compelled in every case to impose the minimum penalty. It is his duty to examine all the evidence in order to be in a condition to exercise his discretion in the imposition of the penalty. In the case for carrying weapons the sentencing judge did not impose on the defendant the minimum penalty; but his order dismissing the motion for a new trial in the murder case reveals the careful study he made of the evidence before imposing the penalty in both cases.

Defendant complains that the sentence imposed on October 10, 1941, in the case for carrying weapons, was rendered after Judge Romany had decreed a new trial, and that for this reason it is not valid. We have already explained the error that Judge Romany made in decreeing a new trial, under the impression that Judge Todd had not found the defendant guilty of said crime. Once he discovered the error, he acted within the authority that §7 of the Code of Civil Procedure grants every judge to amend his pro-

cess and orders so as to make them conformable to thruth and justice. According to appellant's contention, when the case was called on October 3, 1941, the defendant charged that Judge Romany had no jurisdiction to pronounce sentence, since he was not the judge who sat at the trial, and on the following 10th of October, when the case was again called for the imposition of the penalty, he also alleged want of jurisdiction because, according to appellant, the legal term for passing sentence had elapsed. We have already said that, given the extraordinary circumstances of this case, there was no legal reason to prevent Judge Romany from passing sentence because of the fact that he did not sit at the trial. In regard to the alleged legal term for imposing sentence, it seems that appellant believes that subdivision 5 of §29 of the Code of Criminal Procedure, which sets a term of two days within which the district courts shall render final decision in the criminal cases appealed before them, is applicable to this case. The case for carrying weapons originated, according to law, in the district court, and therefore the cited legal rule is not applicable.

■ Our attention is called in these cases to the fact that eight months have elapsed since the defendant was convicted on January 17, 1941, until he was sentenced on October 3, 1941, in the felony case, and on the 10th of the same month in the prosecution for carrying a weapon. We can not find anything in the record to justify such delay, aside from the motion for a new trial filed in the felony case; but be that as it may, it does not appear from the record that at any moment the defendant, before said dates, had insisted on the imposition of the corresponding penalty. That being so, his right to have the sentences imposed within a reasonable term must be considered as waived, and the court retained jurisdiction to impose the same, notwithstanding the fact that a term longer than a reasonable time had elapsed. *Zerbst* v. *Nahas*, (1933) 67 F. (2d) 742. To the same effect see *Miller* v. *Aderhold*, 228 U. S. 206, 77 L. ed. 702.

■ Having already decided the jurisdictional questions raised by the defense, we will now proceed to consider the errors assigned in relation to the following instructions:

"1. In order to reduce the crime of murder to that of manslaugter there must be present provocation sufficient to produce an irresistible passion in a person who ordinarily is able to control himself. The provocation which the law deems sufficient in order to reduce the crime of murder to that of manslaughter must be apparent and it is necessary, in addition, that this provocation has produced in the killer a fit of anger and that solely as a result of that fit of anger the accused has killed the person alleged to have been killed. If said provocation has not produced a fit of anger, and death is inflicted as a result of any motive other than the provocation, then malice exists.

"2. It is my duty to tell you, going further into this matter, although I have not gone into an analysis of the evidence, that in order to determine whether or not this accused acted in self-defense in wounding Tomás López, it is your duty to decide if he acted in self-defense in accordance with the happening which took place at the moment when he inflicted the wound on Tomás López. The evidence has tended to show that an incident between Tomás López and the accused took place either in the yard of the house, according to the testimony for the defense, or in a card game, according to the evidence for the prosecution, as a result of an argument over the collection of twelve cents and that Tomás López hit the accused with a chair and threw him down and he was picked up and carried away and after being in his home that he went to a small café and when he came out he ran into Tomás López again. These first happenings can not serve as a basis for determining whether or not the accused acted in self-defense. The accused testified that in the second meeting Tomás López drew a knife and kicked him and then in self-defense he drew the knife and stabbed him. It is as to this second meeting that you have to determine whether or not the accused acted in self-defense. In other words, no person, including this defendant, because of the fact that he is hit with a chair or whatever it was, can let things remain as they are and after a quarter of an hour, a half-hour, or an hour, go out and attack the person who had attacked him, and then say that he acted in self-defense because he had been hit with a chair. If the accused had stabbed his adversary when he was hit with the chair, then you

might determine whether or not he acted in self-defense. The theory for the defense was that he acted in self-defense at the second meeting and his witnesses have testified, in support of this contention, that Tomás López came back, after having told one of the witnesses that if he ran into Tito he was going to kill him, and that the accused when he saw that he was being attacked a second time, drew the knife and killed him.

''3. The testimony given by the accused should be interpreted and taken into consideration in so far as it may benefit him with respect to his credibility and it was to this end that it was admitted.

''4. An accused may testify or not, according to his wishes. In this case he has testified and you should take his testimony into consideration in the same way as that of any other witness.

''5. You are to judge whether or not he has proved his theory of self-defense. It is my duty to tell you, going further into this matter, although I have not gone into an analysis of the evidence, that in order to determine whether or not this accused acted in self-defense in wounding Tomás López, it is your duty to decide if he acted in self-defense in accordance with the happenings which took place at the moment when he inflicted the wound on Tomás López. The evidence has tended to show that an incident between Tomás López and the accused took place either in the yard of the house, according to the testimony for the defense, or in a card game, according to the evidence for the prosecution, as a result of an argument over the collection of twelve cents and that Tomás López hit the accused with a chair and threw him down and he was picked up and carried away and after being in his home that he went to a small café and when he came out he ran into Tomás López again. These first happenings can not serve as a basis for determining whether or not the accused acted in self-defense. The accused testified that in the second meeting Tomás López drew a knife and kicked him and then in self-defense he drew the knife and stabbed him. It is as to this second meeting that you have to determine whether or not the accused acted in self-defense. In other words, no person, including this defendant, because of the fact that he is hit with a chair or whatever it was, can let things remain as they are and after a quarter of an hour, a half-hour, or an hour, go out and attack the person who had attacked him, and then say that he acted in self-defense because he had been hit with a chair. If the accused had stabbed his adversary when he was hit with the chair,

then you might determine whether or not he acted in self-defense. The theory for the defense was that he acted in self-defense at the second meeting and his witnesses have testified, in support of this contention, that Tomás López came back after having told one of the witnesses that if he ran into Tito, he was going to kill him, and that the accused when he saw that he was being attacked a second time drew the knife and killed him.''

The first challenged instruction did not have the purpose, as the defense erroneously thought, of pointing out to the jury the different modes of manslaughter. Its purpose was to explain to them the circumstance under which a crime which under other circumstances would constitute murder, is reduced to manslaughter. That circumstance exists when as the lower court says, there has been present a provocation sufficient to produce an irresistible passion in a person who ordinarily has control over himself. Not only the provocation should have been present, but also it must have caused the sudden passion under the influence of which the crime was committed. If such provocation does not exist, or if having existed it is not sufficiently severe and the act of the killer is not in proportion with the degree of provocation, the act of killing constitutes múrder, although the accused has not had the aforethought intention of killing. For a lengthy study of this matter, see the annotation in 5 L.R.A. (N. S.) 809. The accused is without doubt in error in believing that it was correct to mention the death which takes place upon a sudden quarrel in this instruction. When a sudden quarrel takes place and as a result of the same one of the adversaries is deprived of his life, in that case, except in certain instances not present here, such as the one where the accused provokes the argument as an excuse for the killing of the victim, the only crime committed is that of manslaughter and consequently, it would be incorrect and would tend to confuse the jury, to the prejudice of the accused himself, to refer to the crime of murder, the evidence not justifying an instruction in relation to that crime.

In another instruction not now challenged by the defense the jury was instructed as to what constitutes the crime of manslaughter and reference was then made to the sudden quarrel as one of the modes of that crime. No reference was then made as to whether or not from the time of the first incident—in which the accused was wounded—until the second incident took place—in which the deceased was killed—there had elapsed a period of time reasonably sufficient to cool down the passion which the first quarrel must have produced in the accused, that is, the legal doctrine which is is known as cooling time. That instruction was unnecessary in this case, in view of the position assumed by the accused to the effect that he caused the death in self-defense, and not under the influence of a fit of anger or sudden passion produced by the wound which earlier had been inflicted upon him by the deceased.

In our judgment the first instruction is correct. Let us consider the second one.

 The instruction of the court to the jury to the effect that, in relation to the doctrine of self-defense invoked by the accused, they should not take into consideration the incident which one hour before had taken place between the deceased and the accused and in the course of which the deceased attacked him in the manner hereinbefore described, was incomplete. It is obvious that if the second incident took place about an hour later, the imminent risk of losing his life or receiving grave bodily injury in which the accused might have found himself, had already disappeared. That being so, he could not successfully allege that a danger which had already disappeared made necessary the killing of his former aggressor. But the evidence for the accused tended to show that he had been warned that the deceased had expressed his intention of depriving him of his life, and in the second meeting the deceased, without being provoked, first kicked him and immediately afterwards assaulted him twice

with the knife which he carried. The accused offered the knife in evidence, alleging that it was the same with which the deceased had attacked him. If the jury had given credit to this evidence, it was logical that it should also have kept in mind what took place in the first incident, since the knowledge which the accused gained on that occasion of what the deceased might do was an element to be considered by the jury for the determination of whether or not the accused had grounds for believing that in killing the deceased he was under imminent danger of losing his life or receiving grave bodily injury.

When the accused took exception to the aforesaid instruction, the court corrected it as follows:

"I have not said that no relation exists between one incident and the other. I want to state that the theory for the defense is that the accused did not act as a result of the first incident, but because in the second incident Tomás López again assaulted him by kicking him and drew a knife. The first incident should be considered in conjunction with all the facts of the case. All the facts of the case are before you and you should take it into consideration, for the purpose of determining whether or not it is true that Tomás López again assaulted him during the second encounter."

The additional instruction, in our judgment, remedied the defects of the one originally given, since in the same it is stated that the incident "should be considered in conjunction with all the facts of the case," and following that it is stated that it may be taken into consideration, "for the purpose of determining whether or not it is true that Tomás López assaulted him during the second encounter." While it is true that the language used in this last statement made by the court is not as clear as it should have been, it may be inferred that what the court intended to say was that they could take it into consideration, in case they deemed it true, that Tomás López again assaulted him during the second encounter. Of course, if Tomás López did not again assault the accused during the second encounter, there was

no possibility of taking into consideration the alleged self-defense.

■ In relation to the instruction which we are considering, the accused complains that ''after the defense and the prosecution had stipulated that an analysis of the evidence should not be made,'' the court, in spite of that, made a slight analysis of the evidence introduced by both sides.

Although in truth this stipulation existed, it could not relieve the court of the imperative duty imposed upon it by paragraph 8 of §233 of the Code of Criminal Procedure, which reads as follows:

''Section 233. . . . . . . .
''8. Then. the judge (after the addresses are ended) in open court and in the presence of the parties and counsel, will sum up the case to the jury, omitting all superfluous circumstances, pointing out wherein the main question and principal issues lie, stating what evidence has been given to support them, with such remarks as he thinks necessary for their direction, and giving them his opinion solely in matters of law arising upon that evidence.'' (Parenthetical matter supplied.)

The practice of the judge omitting to sum up the case to the jury is not only contrary to the express provisions of the law, but is also prejudicial to the ends of justice. The reason why the evidence should be summed up, as the transcribed section states, is that the essential facts adduced by both parties should be pointed out to the jury. In other words, to sift the evidence, thus preventing the jury from being led into error or confusion by taking into consideration facts immaterial to the decision of the case. What is more, in his instructions the judge ought not to read the bare letter of the law. The jury is comprised of persons not learned in the law, and to read to them the law in this way is the equivalent of placing in their hands the statute in order that they may decide the case in accordance with the interpretation which they may deem most fitting. For that reason the better practice is, after summing up, to give the

jury the different conclusions at which, in weighing the evidence, they may arrive and to indicate to them the verdict that should be given in relation to each one of those conclusions. In that way the duties of the jury are circumscribed to their true limits, that is, the determination of questions of fact, and the situation is thereby avoided of the jury being in agreement as to the facts and erring in applying the law. In our judgment the error assigned in relation to the instruction which we have just considered was not committed.

■ The third challenged instruction was erroneous, but the error was not prejudicial to the accused. As appears from the evidence at the trial, the district attorney introduced in evidence the testimony given by the accused on the night of the occurrence before said officer. This testimony was offered for the purpose of impeaching the oral testimony which the accused had given at the trial. In this instruction, the court erroneously tells the jury that they should take this testimony "into consideration in so far as it may benefit him with respect to his credibility and it was to this end that it was admitted." If this testimony is to be taken into consideration only in so far as it favors the accused, there is no doubt that such an instruction, while erroneous, could in no way prejudice him.

The fourth challenged instruction is also deficient. In it the jury is instructed that the testimony of the accused should be taken into consideration in the same way as that of any other witness. Up to that point it is correct. But something was missing, that is, that in considering the testimony of the accused, the jury should keep in mind the interest which every accused naturally has in his own case. However, this deficiency far from prejudicing him, favored the accused, because according to it he was to be considered as a witness entirely lacking in interest in the matter as to which he testified.

■ Another of the errors assigned by the appellant is to the effect that the court held that the district attorney had not erred in the way in which he warned the accused of his legal rights in taking down his sworn statement on the night of the occurrence, which statement he introduced in evidence at the trial for the purpose of impeaching defendant's testimony. Without doubt appellant is referring to the warning which in this jurisdiction is customarily given to every accused when his statement is taken at the preliminary investigation, to wit: that he has been charged with a crime, that he has a right to testify or to refuse to testify, and that if he testifies his testimony may be used against him. These warnings were given timely, as appears from the sworn statement itself, which was introduced in evidence. However, it seems advisable to say once again that such warnings are not necessary in order that the statement be admissible in evidence. Both §2 of the Organic Act and §7 of the Code of Criminal Procedure only guarantee an accused the right not to be compelled to serve as a witness against himself. For more than 36 years the decisions of this court which interpret the cited provision have held that the only requirement in order that said statement be admissible in evidence is that it be given voluntarily. *People* v. *Kent*, 10 P.R.R. 325; *People* v. *Martínez*, 23 P.R.R. 212; *People* v. *Rodríguez*, 28 P.R.R. 464; *People* v. *Colón et al.*, 39 P.R.R. 817; *People* v. *Saldaña*, 40 P.R.R. 557; *People* v. *Méndez*, 54 P.R.R. 184.

In the case at bar defendant's former statement, offered in evidence for the purpose of impeaching his testimony at the trial, was given voluntarily and for that reason was admissible.

■ At the trial, for the purpose of impeaching the testimony of Marcelina Alicea, wife of the accused, the district attorney questioned her in relation to the sworn statement which she had given before him on the night of the occurr-

ence: The document containing the statement was not shown to the witness, and both the cross-examination on the part of the district attorney, which dealt with what was said in the sworn statement referred to and the answers of the witness denying or saying that she did not remember having testified to that effect, were included in the stenographic record, in spite of the fact that the sworn statement was never offered in evidence. Without doubt the procedure followed by the district attorney for the impeachment of the testimony of this witness was not the one provided by law. Section 245 of the Code of Criminal Procedure and 159 of the Law of Evidence, which are the same, provide the procedure to be followed for the impeachment of the testimony of a witness by means of a written statement which he has previously given. The document by means of which the witness is to be impeached should be shown to him before he is questioned in relation to the same. The purpose for which the law requires that the statement be shown to him before he is questioned as to the contents of the same is to allow the witness to read it or have it read to him, and once aware of its content, he should be asked whether or not he wrote it or signed it, and if he admits it, his attention should then be called to the contradictions or inconsistencies which may exist between his first statement and his oral testimony, also allowing him to relate the facts or circumstances which may explain or reconcile the inconsistent statements or that show their relation among themselves and the significance and purpose of the same. Once the witness admits the authenticity of the written statement, it will be offered in evidence, and once admitted, it will be read to the jury as the best evidence of what the document contains. In that way the jury may determine if in reality the contradiction exists and will give the oral testimony the credit to which it may be entitled. If the witness denies having written or signed such a statement, then its authenticity may be proved and it

may be offered in evidence. Once admitted, it will be read to the jury in the same manner as if its authenticity had been admitted. See *People* v. *Rodríguez,* 36 P.R.R. 388 and *People* v. *Lafontaine,* 43 P.R.R. 27.

In the case at bar, without the witness at any time admitting that the document which the district attorney had in his hands was a satement made by her and was apparently reading from the same, the district attorney limited himself to asking her more or less the following: Is it not true that in the testimony which you gave on October 5, 1940, you stated such and such a thing? The witness would deny some things and as to others would say that she did not remember having then said what the district attorney stated she had said. The defense made timely objection, but its objection was overruled and it took an exception.

It is obvious that in proceeding in this manner the district attorney was doing indirectly what the law prohibits him from doing directly because, without having introduced in evidence the written statement, he was filling the record with its contents and placing and bringing it to the attention of the jury. But the error thus committed was not prejudicial to the substantial rights of the accused. In the statement supposedly given on the night of the occurrence, the witness testified that when the accused reached his home after the first encounter having taken place in which he was wounded, he took a knife from there. In her oral testimony the witness stated that she did not see him take any knife from his home. Defendant himself testified at the trial that he left the house carrying the knife and that he carried it in spite of the fact that he left for the purpose of seeking medical attendance, because he was afraid that the deceased might kill him. (Tr. of Ev., p. 71.) This being so, how could it be material for the wife to testify that she did not see that the accused, upon leaving his house after having

been wounded, had armed himself with a knife, if the accused himself had admitted it?

Although said error existed, it did not prejudice the substantial rights of the accused. For that reason, it is not a ground for reversal of the judgment.

The accused did not appeal from the order denying the motion for a new trial. Consequently we are without jurisdiction to review it. See *People* v. *Mediavilla*, 54 P.R.R. 554.

The lack of merit of the remaining assignments is so manifest that their discussion in this opinion is both unnecessary and useless.

The two judgments appealed from should be affirmed.

Mr. Justice Todd, Jr., did not participate herein.